UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALFONSO AYON-NUNEZ,<br><br>Defendant. | No. 1:16-cr-00130-DAD-BAM-1<br><br>ORDER DENYING DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)<br><br>(Doc. No. 68) |

Pending before the court is a motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) brought on behalf of defendant Alfonso Ayon-Nunez. (Doc. No. 68.) That motion is based in part on the purported risks allegedly posed to defendant Ayon-Nunez by the ongoing coronavirus ("COVID-19") pandemic. For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On August 16, 2016, an indictment was returned charging defendant Alfonso Ayon-Nunez in Count 1 with distribution of 50 grams of actual methamphetamine and 100 grams or more of heroin on July 14, 2016 in violation of 21 U.S.C. §§ 841(a)(1), in Count 2 with the possession with the intent to distribute 50 grams of actual methamphetamine, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 1 kilo or more of a mixture or substance containing a detectable amount of heroin on August 10, 2016 in violation of

21 U.S.C. §§ 841(a)(1), and in Count 3 with possession with the intent to distribute heroin and methamphetamine on August 10, 2016 in violation of 21 U.S.C. §§ 841(a)(1). (Doc. No. 8.) On June 11, 2018, defendant entered his pleas of guilty to Counts 1 and 2 of the indictment. (Doc. Nos. 24, 35.) On April 1, 2019, the court sentenced defendant to the mandatory minimum term of 120 months in the custody of the U.S. Bureau of Prisons ("BOP") on each count with those sentences to run concurrently, followed by concurrent terms of supervised release of 60 months, . (Doc. No. 54, 55.) The court also imposed the mandatory $200 special assessment. (*Id.*)

Defendant Ayon-Nunez is currently serving his sentence at the Giles W. Dalby Correctional Institution ("CI Dalby"), a private prison located in Post, Texas that contracts with the U.S. Bureau of Prisons ("BOP"). (Doc. Nos. 68 at 12; 75 at 3.) The parties agree that with application of good time credit, defendant's projected release date is February 16, 2025. (Doc. Nos. 68 at 12; 75 at 3.) The parties also agree that defendant has served 50 months of his 120-month custodial sentence, which represents nearly 49% of his sentence if good time credits are applied and 41.8% of his sentence if good time credits are not applied. (Doc. Nos. 68 at 9, 12; 75 at 3.)

On October 2, 2020, defendant filed the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).[1] (Doc. No. 68.) On October 20, 2020, the government filed its opposition to the motion, and on October 23, 2020, defendant filed his reply thereto. (Doc. Nos. 75, 79.)

Though defendant does not mention in his pending motion that he has already been infected with COVID-19 since he began serving his sentence, the government explains in its opposition that defendant contracted COVID-19 and recovered after receiving treatment at a local

---

[1] Defendant previously sought a reduction of his sentence and filed a motion under 18 U.S.C. § 3582(c)(1)(A) on August 5, 2019, in which defendant claimed in conclusory fashion that he suffered from several medical conditions, including severe back injuries and epilepsy, and that CI Dalby was not adequately treating his medical conditions. (Doc. Nos. 56, 62.) On February 12, 2020, the court denied defendant's motion for compassionate release, concluding that defendant had failed to substantiate his claims and noting that "the one-page record submitted to date paints an unremarkable picture in that regard and at least suggests that the defendant is receiving medical treatment." (Doc. No. 67.)

hospital near the place of his imprisonment. (Doc. No. 75 at 1.) Neither party provides specifics regarding when defendant Ayon-Nunez tested positive for COVID-19, but they agree that he was intubated and on a ventilator from at least July 22, 2020, to August 12, 2020. (Doc. Nos. 75 at 9; 79 at 8.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."). Those limited circumstances include compassionate release in extraordinary cases. *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)   extraordinary and compelling reasons warrant such a reduction; or

---

[2] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

3

    (ii)  the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

  The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar.

---

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[4] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, a large and growing number of district courts across the country have concluded that because the Sentencing Commission has not amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c). *See, e.g.*, *United States v. Parker*, 2:98-cr-00749-CAS, 2020 WL 2572525, at *8–9 (C.D. Cal. May 21, 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district courts to have done so agree that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

**ANALYSIS**

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*. Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

*Rodriguez,* 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-cr-00124-LHK-

4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 2020 WL 2572525, at *4; *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

### A.   Administrative Exhaustion

Defendant asserts, and the government does not dispute, that defendant has exhausted his administrative remedies prior to filing his pending § 3582 motion. (Doc. Nos. 68 at 8; 75 at 4.) Because failure to exhaust is normally viewed as an affirmative defense, the court will accept the government's concession and turn to the merits of defendant's motion.

### B.   Extraordinary and Compelling Reasons

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, courts agreed that it may be relied upon by defendants bringing their own motions for reductions in their sentence under the FSA. *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id*. In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

/////

/////

> The defendant is
>
> > (I)  suffering from a serious physical or medical condition,
> >
> > (II)  suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id*. at cmt. n.1(A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, many courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release when the particular circumstances of a case are considered in their totality. *See, e.g.*, *Parker*, 2020 WL 2572525, at *9–10 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[5]

////

---

[5] Here, although defendant Ayon-Nunez is 68 years old (Doc. No. 68 at 9), his age and age-related factors do not play a role in consideration of his pending motion because he has only served 50 months, which is nearly half, not 75 percent, of his ten-year sentence. (*Id.* at 9, 22.)

Defendant Ayon-Nunez argues that extraordinary and compelling reasons warranting reduction of his custodial sentence exist because: (1) he is 68 years old and suffers from obesity and hypertension, which place him at a higher risk of suffering death or severe illness if he were to be re-infected with COVID-19; and (2) he lives in congregate living at CI Dalby, a privately-run correctional institution that does not release any information regarding its COVID-19 testing rate and where two prisoners have already died from COVID-19. (Doc. No. 68 at 9–13.) In particular, defendant points to guidance from the U.S. Centers for Disease Control and Prevention ("CDC"), which warns that "the risk for severe illness from COVID-19 increases with age." (*Id.* at 9–10) (citing *People at Increased Risk: Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Sept. 11, 2020)). In addition, defendant Ayon-Nunez cites to the CDC's guidance that people who suffer from obesity with a body mass index ("BMI") of 30 or higher, as he does, face an increased risk of severe illness from COVID-19 and that people who suffer from hypertension might be at an increased risk for suffering severe illness from COVID-19. (*Id.* at 10–11) (citing *People at Increased Risk: People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Oct. 16, 2020)).

In its opposition, the government contends that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison" is not an extraordinary and compelling reason supporting defendant's early release from imprisonment. (Doc. No. 75 at 8.) The government argues that defendant has failed to carry his burden to establish his eligibility for compassionate release because, although his slight obesity (BMI of 31) and hypertension are CDC-recognized risk factors that increase his risk of suffering severe illness were he to contract COVID-19 again, "he has already contracted and recovered from a severe case of COVID-19 after receiving treatment from a local hospital." (*Id.* at 1, 8–9.) According to the medical records filed by the government, defendant was intubated and placed on a ventilator from at least July 22, 2020 to August 12, 2020. (*Id.* at 9; Doc. No. 81 at 56–69.) While the government recognizes that "[t]he science surrounding COVID-19 is still developing, and it is unknown whether Ayon-Nunez

8

will contract the virus again and/or experience other symptoms," the government argues that defendant's fears of reinfection and concerns in that regard are undermined by the fact that he recovered from a severe case of COVID-19 and thus "endured the illness seemingly without substantial adverse health outcomes and has returned largely to his baseline health status." (Doc. No. 75 at 11.) According to the government, defendant's recovery "underscores the reality that, even with his age [of] 68, and health concerns, infection did not result in serious complications," and shows that "BOP medical staff responded quickly, and transported him to a local hospital where they continually monitored and treated him until he had recovered." (*Id.*)

In reply, defendant asserts that the fact that he "has already contracted COVID-19 at CI Dalby shows the inadequacy of that facility's ability to protect him from the disease." (Doc. No. 79 at 6.) In addition, to substantiate his fear of reinfection, defendant points to guidance from the CDC, which has clarified that "science does not imply a person is immune to reinfection with SARS-CoV-2, the virus that causes COVID-19, in the 3 months following infection." (*Id.* at 7) (citing *Updated Isolation Guidance Does Not Imply Immunity to COVID-19*, CDC Media Statement, Aug. 14, 2020, https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html (last accessed October 26, 2020)).

As an initial matter, the undersigned does not discount the possibility of reinfection from the virus. As one district court has observed: "Without scientific conclusions as to whether reinfection is possible or how long COVID-19 immunity lasts, [courts have] err[ed] on the side of caution to avoid potentially lethal consequences." *States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020); *see also United States v. Hanson*, No. 6:13-cr-00378-AA-1, 2020 WL 3605845, at *4 (D. Or. July 2, 2020) ("[T]here is no current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from reinfection, as several courts have recently acknowledged."); *but see United States v. Molley*, No. 15-cr-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020) (concluding that the uncertainty surrounding the danger of re-infection with COVID-19 "cuts against compassionate release," in part because it is the defendant's burden to establish that "extraordinary and compelling" reasons for release exist). In contrast to the several cases cited by the government, in which courts have denied

compassionate release motions brought by inmates who had previously tested positive for COVID-19 and experienced *asymptomatic* infections (Doc. No. 75 at 9–11), here, defendant suffered a severely *symptomatic* infection that necessitated a lengthy hospitalization with intubation and nearly a month on a ventilator.  Despite the government's characterization of defendant's COVID-19 infection as one that "did not result in serious complications" (Doc. No. 75 at 11), the CDC has stated that "[s]evere illness means that the person with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die." *See People at Increased Risk: Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Sept. 11, 2020)).  Thus, the court finds that defendant's fear of reinfection and the potential consequences to him were that to occur, including *again* suffering severe illness, to be particularly well-placed in this case.

      Moreover, it is undisputed that according to the CDC, "the risk for severe illness from COVID-19 increases with age, with older adults at highest risk," that adults who suffer from obesity with a BMI of 30 or higher are "at increased risk of severe illness from the virus that causes COVID-19," and adults with hypertension "might be at an increased risk for severe illness from the virus that causes COVID-19."  *See People at Increased Risk: Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Sept. 11, 2020); *see also People at Increased Risk: People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Oct. 16, 2020).  Here, defendant has shown not only that he suffers from these medical conditions and thus faces an increased risk of suffering severe illness from COVID-19—he actually suffered severe illness in July and August 2020 as a result of contracting the virus caused by COVID-19.  Thus, the court is not persuaded by the government's assertion that "the nightmare scenario that Ayon-Nunez feared has not come to pass."  (Doc. No. 75 at 11.) Fortunately, defendant Ayon-Nunez did not die, but death is not the exclusive risk posed to defendant if he were to be re-infected with COVID-19.

The court notes, however, that defendant Ayon-Nunez has not shown, or even argued for that matter, that the staff at CI Dalby is unable to monitor and adequately treat his medical conditions or that CI Dalby staff failed to care for him when he contracted COVID-19. *See United States v. Weidenhamer*, No. 16-cr-01072-PHX-ROS, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019) ("Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release."); *see also United States v. McCollough*, No. 15-cr-00336-001-PHX-DLR, 2020 WL 2812841, at *2 (D. Ariz. May 29, 2020) ("Since Defendant has contracted COVID-19, the relevant questions concern (1) the course of his illness, (2) the state of his health, (3) his prognosis, and (4) the adequacy of the care and treatment being provided to him in BOP given his pre-existing conditions. . . .. There is no evidence that the circumstances surrounding Defendant's health or treatment are extraordinary or compelling."). Indeed, the extensive medical records filed by the government under seal in support of its opposition suggest that CI Dalby is providing defendant adequate medical care for his obesity and hypertension, as well as several other medical conditions that are not relevant to consideration of the pending motion. Those records reflect that defendant is being monitored as shown by his frequent medical visits and administration of laboratory tests, and that he has been prescribed and provided the medications necessary to self-care for his health conditions. (*See generally* Doc. No. 81.) In addition, defendant has not provided the court with any evidence or proffer regarding the current state of his health, including whether he has lingering symptoms from his COVID-19 infection, or the adequacy of the medical treatment he has received at CI Dalby. Though the court notes that defendant's medical records reflect that on a visit to the chronic care clinic on September 14, 2020 for a flare up of lower back pain, he reported that "he has been feeling well since recovering from Corona virus infection." (Doc. No. 81 at 39.)

Instead, defendant's argument focuses on CI Dalby's inability to protect him from being infected with COVID-19 initially and to prevent the spread of COVID-19 within that facility. (Doc. No. 79 at 1–6.) In this regard, defendant states that "[a]s of October 23, 2020, [CI Dalby], has had two of its prisoners die from COVID-19," and CI Dalby "currently has four active case[s] of COVID-19 and 81 of its prisoners have recovered from COVID-19." (*Id.* at 3.) Defendant

also points to BOP's alleged failures to control the spread of COVID-19 broadly in facilities across the country and cites to various cases that involved inmates in other BOP facilities. (*Id.* at 1–6.) But defendant has not shown that there has been a significant outbreak of the virus at CI Dalby specifically. Moreover, defendant has also not shown that he is being prohibited from taking appropriate precautions to avoid contracting COVID-19 and that his ability to provide self-care at CI Dalby is substantially diminished. *See United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. April 24, 2020) ("[T]he presence of COVID 19 . . . necessitates a more expansive interpretation of what self-care means" and thus the inability of individuals at high risk of becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask and maintain social distancing is an inability to provide self–care) (citation omitted). Rather, defendant selectively quotes from a remote inspection report of CI Dalby issued by the Department of Justice's Inspector General, stating:

> At Dalby, inmates live in:
>
> • barracks, or open dormitory-style housing units in which inmate beds are in close proximity and are adjacent to shared communal spaces or
>
> • celled housing units in which two inmates are assigned a cell with a door that closes at night. Inmates in celled housing units share communal space during the day.

(Doc. No. 68 at 12.) However, merely asserting that prisoners at CI Dalby experience congregate living is not sufficient to show an inability to practice self-care during the COVID-19 pandemic. While the housing style at CI Dalby may prevent social distancing at times, defendant has not provided any evidence about *his* current experience; he has not specified whether he is housed in the barracks, or in a cell with one other inmate, and the degree to which he has been allegedly unable to socially distance in that space, as well as in common areas. Defendant's citation to the court's order granting compassionate release in *United States v. Shehata*, No. 15-cr-20052-JWL, 2020 WL 4530486, at *1 (D. Kan. Aug. 6, 2020) for the proposition that "[l]iving in the communal setting of Dalby while having COVID-19 risk factors is an extraordinary circumstance warranting a grant of compassionate release," (Doc. No. 68 at 13) is both unavailing and inaccurate. In that case, the district court made no such finding or determination and in fact did

12

not describe or discuss conditions at CI Dalby in any way; the court stated merely that the defendant in that case was "presently incarcerated at Giles W. Dalby CI." *See Shehata*, 2020 WL 4530486, at *1.

In light of all of the above, the court finds that defendant Ayon-Nunez has not satisfied his burden of showing that "extraordinary and compelling reasons" warrant his compassionate release. On one hand, defendant suffers from medical conditions that put him at higher risk for suffering a severe illness were he to again contract COVID-19, in addition to his advanced age, and he in fact has suffered a severe COVID-19 infection requiring his hospitalization and placement on a ventilator for an extended period of time. On the other hand, it appears that defendant has been adequately monitored and treated for his medical conditions and has, fortunately, recovered from his COVID-19 infection without suffering lingering symptoms. In addition, defendant has not advanced any specific allegations regarding any lack of access on his part to protective gear or cleaning and sanitizing supplies, or regarding *his* lack of ability to social distance at CI Dalby specifically. In other words, defendant has not provided any evidence in support of his motion for compassionate release regarding, or even descriptions of, the conditions that he experienced when he was infected with COVID-19 or the conditions that he is currently facing at CI Dalby, and most importantly, whether he is unable to provide self-care at CI Dalby as a result of those conditions. The court also notes that as of November 4, 2020, the BOP now reports that only 2 inmates and zero staff members are confirmed as having active COVID-19 cases at CI Dalby. *See* https://www.bop.gov/coronavirus/ (last reviewed Nov. 4, 2020).[6] Thus, the current infection rate at CI Dalby does not at this time support defendant's contention that extraordinary and compelling reasons warranting his compassionate release exist by virtue of his incarceration at CI Dalby, even when considered in combination with his age, medical conditions, and his fortunate recovery from a severe COVID-19 infection suffered since his imprisonment.

/////

---

[6] The undersigned does not necessarily accept these reported numbers at face value given the manner in which the CDC guidelines apparently allow for individuals to be counted as recovered from the virus without confirming test results. However, there is also no evidence before the court contradicting those reported numbers.

Accordingly, the court concludes that defendant Ayon-Nunez has not met his burden of demonstrating extraordinary and compelling reasons for compassionate release under § 3582(c)(1)(A). Therefore, his motion will be denied.

**C.      Consistency With the § 3553(a) Factors**

Finally, even if defendant Ayon-Nunez's motion was supported by a showing of extraordinary and compelling reasons for his compassionate release, the undersigned is not persuaded that the requested reduction in his sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a).[7] *See Parker*, 2020 WL 2572525, at *11.

Defendant contends that he does not present a danger to the community if he were to be released, and that there is no reason to believe otherwise, because he did not commit a violent offense, he has no prior criminal convictions, and he has had no disciplinary violations while in BOP custody. (Doc. No. 68 at 13, 21–22.) Defendant also contends that if he were to stay in the United States and not be deported to Mexico,[8] he would remain under the supervision of the U.S. Probation Office, thereby further reducing any threat to community safety if he were released. (*Id.* at 22.) Defendant also contends that granting him compassionate release now would be consistent with the § 3553(a) sentencing factors, even though his "original 10-year sentence was entirely appropriate," because the COVID-19 pandemic has changed the world, and the court "undoubtedly did not intend to sentence Mr. Ayon-Nunez, an elderly person who is already in the

---

[7] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

[8] In the pending motion, defendant states that he is aware of the possibility that upon release, "he may be held on an immigration detainer and placed in removal proceedings." (Doc. No. 68 at 13.)

latter part of his life, to a life-threatening situation." (Doc. No. 79 at 11.) Moreover, in light of his intubation and lengthy hospitalization as a result of having contracted COVID-19 while imprisoned, defendant argues that he has already suffered greatly and has been sufficiently punished during his incarceration. (*Id.*)

The government counters that defendant has served less than half of his sentence, which the court imposed just 18 months ago after "carefully weigh[ing] and thoughtfully consider[ing] the § 3553 factors" and "considering those same factors now, little has changed." (Doc. No. 75 at 13.) The government also argues that defendant "poses a very real danger to the community," because he "was engaged in a sophisticated drug smuggling operation involving large amounts of methamphetamine and heroin," and "tools of the drug trade [were] found at Ayon-Nunez's residence, including a truck with a hidden compartment, a large amount of cash, and multiple firearms," including a handgun, a pistol, an AK-47 rifle, and an SKS 7.62 caliber rifle. (Doc. No. 75 at 3, 12.) The government emphasizes that defendant's "drug trafficking activities were not contained within a fleeting moment," they were "long-term, extensive, and . . . more dangerous as a result of Ayon-Nunez's possession of firearms." (*Id.*)

In his reply, defendant contends that the firearms referred to by the government were never brought to a drug transaction and were not found with any drugs. (Doc. No. 79 at 9–10.) According to defendant, "[a]ll indications are that the guns were for protection of the home, not criminal activity." (*Id.* at 10.)

As noted above, defendant is serving a 120-month term of imprisonment after pleading guilty to possession with intent to distribute and distribution of 50 grams of actual methamphetamine or 500 grams of a mixture containing a detectable amount of methamphetamine and 1 kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1). (Doc. Nos. 54, 55.) Defendant's criminal offense was a very serious one, in which he obtained large amounts of methamphetamine from Mexico, smuggled the drugs into the United States for distribution, and sold those drugs. (Doc. No. 37 at 4–6.) With his acceptance of responsibility acknowledged, the presentence report in his case determined that defendant's total offense level was 37, that his criminal history category was I, and his advisory sentencing guideline range therefore called for a

term of imprisonment of between 210 and 262 months. (*Id.* at 9, 12.)[9] After giving due consideration to the § 3553(a) sentencing factors, including his age, health issues and physical difficulties as well as his minimal criminal history and challenging upbringing, the undersigned varied significantly downward from the advisory sentencing guideline range and sentenced defendant to a 120-month term of imprisonment, which was the Congressionally mandated minimum sentence in light of the counts of conviction. (Doc. No. 57.) In short, defendant Ayon-Nunez received the most lenient sentence possible given the seriousness of this case and the amount of narcotics involved in his criminal conduct.

The court recognizes that granting the pending motion would not arguably be inconsistent with consideration of all of the other § 3553(a) sentencing factors. In this regard the court acknowledges that defendant's lack of significant criminal history may suggest that he does not pose a danger to the safety of the community.[10] But, "[t]he length of the sentence remaining is an additional factor to consider in any compassionate release analysis,' with a longer remaining sentence weighing against granting any such motion." *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993 at *6 (N.D. Cal. May 26, 2020) (quoting *United States v. Connell*, No. 18-cr-00281-RS, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020)); *see also United States v. Lonich*, No. 1:14-cr-00139-SI-1, 2020 WL 26148743, at *3 (N.D. Cal. May 21, 2020) (denying motions for compassionate release, noting, "the Court finds it significant that

---

[9] Given that 50 grams of actual methamphetamine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine as well as 1 kilogram or more of a mixture or substance containing a detectable amount of heroin were involved in defendant Ayon-Nunez's offense of conviction, the charges carried with them a ten-year minimum mandatory sentence. *See* 21 U.S.C. § 841(b)(1)(A). Indeed, defendant was held accountable for approximately 4.5 kilograms of methamphetamine and 3.5 kilograms of heroin under the Sentencing Guidelines. (Doc. No. 37 at 7.)

[10] Defendant contends that his possession of firearms was not necessarily connected with his distribution of a large amount of controlled substances. The court is not persuaded by this argument. A search of defendant's bedroom at his residence revealed a padlocked case containing a .380 caliber semiautomatic handgun and elsewhere in the bedroom a .22 caliber pistol, an AK-47 rifle, two bundles currency totaling $12,400, ammunition for the firearms, and a SKS 7.62 caliber rifle loaded with eight rounds of ammunition underneath a mattress. (Doc. No. 37 at 5-6.) The discovery of this evidence in defendant's bedroom does, in the court's view, strongly suggest that he poses a danger to the safety of the community.

defendants have served far less than half of their sentences"). Here, as of the date of this order, defendant Ayon-Nunez has served only approximately 50 months of his 120-month sentence, which is less than 50% of the sentence imposed even if good time credits are applied. (*See* Doc. Nos. 68 at 9, 12; 75 at 3.) Moreover, as noted above, the statutory mandatory minimum sentence for defendant's offense is a ten-year term of imprisonment. In the court's view, a reduction of defendant's 120-month sentence effectively to one of less than five years would not adequately reflect the seriousness of his offense of conviction, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct. *See United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020); *Shayota*, 2020 WL 2733993 at *5; 18 U.S.C. § 3553(a).

Thus, on balance, the court finds that granting defendant's motion and reducing his sentence to time served would not be consistent with the § 3553(a) sentencing factors.

## CONCLUSION

Because defendant Ayon-Nunez has failed to demonstrate that "extraordinary and compelling" reasons exist justifying a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A) or that such a reduction at this time would be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a), his motion for compassionate release (Doc. No. 68) is denied.

IT IS SO ORDERED.

Dated: **November 5, 2020**

_____
UNITED STATES DISTRICT JUDGE

17